## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

GARRETT A. ARROWOOD,

     Petitioner,

v.                                                    Case No. 4:20-cv-151-MW/MJF

RICKY D. DIXON,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Garrett A. Arrowood, proceeding with counsel, has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254, with a supporting memorandum. Docs. 7, 10. Respondent ("the State") answered, providing relevant portions of the state court record. Docs. 15, 16. Arrowood replied. Doc. 18. Pursuant to court order, Doc. 19, Arrowood provided a more definite statement of his first claim. Doc. 20. The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Arrowood is not entitled to habeas relief.[1]

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY[2]

On the evening of June 22, 2015, Arrowood and two cohorts (Rodney Whiddon and Manden Whiddon) burglarized Michelle Strickland's home. The men stole arrowheads and three firearms (a .357 caliber revolver, a Smith & Wesson .45 caliber pistol, and a Kel-Tec .32 caliber pistol). During the course of the burglary, Strickland was shot three times in the face and head while she was seated in her car. Strickland was Arrowood's aunt. Arrowood later sold some of the stolen arrowheads, attempted to sell others, and also attempted to sell Strickland's Smith & Wesson .45 caliber pistol.

At the time of the crimes, Arrowood was a drug addict. Arrowood lived with the Whiddons on their property. The three men shared a camper.

When police searched the Whiddons's camper, they found Strickland's Kel-Tec .32 caliber pistol underneath Arrowood's pillow. The ammunition for Strickland's .357 revolver was found in Arrowood's car. The .357 revolver itself, along with the Smith & Wesson .45 pistol, were discovered in an outbuilding on the Whiddons's property.

---

[2] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. Doc. 15-2 through 15-3, Ex. A at 868-1541 (Trial Tr.); *see also Jackson v. Virginia*, 443 U.S. 307 (1979). This Report and Recommendation does not detail all of the evidence against Arrowood, only that which is necessary to provide context for his habeas claims.

No forensic evidence linked Arrowood to his aunt's burglary and murder. The State, however, had strong circumstantial evidence—as well as Arrowood's various statements to law enforcement and others—that linked him to the crimes.

For example, the person to whom Arrowood attempted to sell Strickland's Smith & Wesson .45 pistol, Troy Whitehurst, recalled an unusual statement Arrowood made when he offered the gun to Whitehurst. Arrowood assured Whitehurst that the gun was "registered to a dead man." Doc. 15-2, Ex. A at 1035-36.[3] The gun belonged to Strickland's late husband (Arrowood's uncle), who had died three years prior to the theft. *Id.* at 1175-77.

In Taylor County Circuit Court Case No. 2015-CF-198, a grand jury indicted Arrowood for First Degree Murder While Armed (Count I), Burglary While Armed (Count II), and Dealing in Stolen Property (Count III). Doc. 15-2, Ex. A at 877. The Whiddons were charged later.

Arrowood's defense counsel investigated various lines of defense, including an alibi defense. After those theories became problematic, counsel developed a "rush to judgment" theory for a defense.

---

[3] Citations to the state-court record are to the electronically-filed exhibits attached to the State's answer. Doc. 15. The citation references the docket entry number followed by the lettered exhibit and the page number according to the Bates stamp number at the bottom center of the page.

The "rush to judgment" theory used the State's forensic evidence—shattered glass outside of Strickland's car (from the driver's side window), and the Whiddons's blood (but not Arrowood's) inside Arrowood's vehicle—to suggest that the Whiddons were the true killers and to encourage doubt about Arrowood's participation in the crimes. Under this theory, the Whiddons duped Arrowood into providing information about his family's habits and the location of valuables inside Strickland's home, to enable them to plan the burglary. The Whiddons then used Arrowood's vehicle to commit the crimes. When law enforcement zeroed in on the Whiddons and Arrowood as suspects, the Whiddons cozied up to the lead investigator and steered the investigation toward Arrowood.

After a four-day trial, the jury found Arrowood guilty of First Degree Murder, Burglary of a Dwelling, and Dealing in Stolen Property. Doc. 15-3, Ex. A at 1534-36. To defense counsel's credit, the jury also found that the State failed to prove beyond a reasonable doubt that Arrowood actually possessed a firearm during the commission of the murder and burglary. *Id*. at 1534-35.

On April 27, 2016, the trial court adjudicated Arrowood guilty and sentenced him to life imprisonment for the felony murder, which was the mandatory minimum. Doc. 15-3, Ex. A at 1576-77 (Sentencing Tr.). The trial court sentenced Arrowood to 15 years of imprisonment for the burglary, and 15 years of imprisonment for dealing in stolen property, to run concurrent with each other but consecutive to the

life sentence. *Id*. Arrowood filed a notice of appeal, but voluntarily dismissed the appeal on July 14, 2016. Doc. 15-4, Ex. B.

On January 23, 2017, Arrowood, proceeding with counsel, filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he later amended. Doc. 15-1, Ex. A at 134-65 (Mot. for Postconviction Relief); *Id*. at 647-95 (Am. Mot. for Postconviction Relief). Arrowood's amended motion raised two types of claims: ineffective-assistance-of-trial counsel claims and prosecutorial-misconduct claims. *Id*. at 662, 690 (identifying the two categories of claims).

The state circuit court conducted an evidentiary hearing and denied relief on all claims. Doc. 15-3, Ex. A at 1686-2149 (Evidentiary Hr'g Tr.); Doc. 15-3, Ex. A at 1582-1685 (Evidentiary Hr'g Ex.); Doc. 15-3, Ex. A at 2194-2238 (Order & Attach.). The Florida First District Court of Appeal ("First DCA") affirmed *per curiam* and without written opinion. *Arrowood v. State*, No. 1D19-0384, 290 So. 3d 457 (Fla. 1st DCA 2020) (Table) (copy at Doc. 15-7, Ex. F). The mandate issued March 5, 2020. Doc. 15-7, Ex. F.

Arrowood filed his counseled federal habeas petition on March 24, 2020. Doc. 1. Arrowood's amended petition raises two claims alleging ineffective assistance of trial counsel. Doc. 7 (Am. Pet.); Doc. 20 (Pet'r's More Definite Statement). The State asserts a procedural default defense to Arrowood's second claim. Doc. 15. The

State argues that even if both claims are deemed properly exhausted, Arrowood fails to satisfy the demanding standard for habeas relief. Doc. 15.

## II. GOVERNING LEGAL PRINCIPLES

### A.    <u>Section 2254 Standard of Review</u>

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[4] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

---

[4] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Under the *Williams* framework, the federal court first must determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has emphasized often that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement</u>.

*Richter*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

**B.**    <u>**Federal Law Governing Claims of Ineffective Assistance of Trial Counsel**</u>

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23

(2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."). As a consequence of this burden, "when the evidence is unclear . . ., [courts] presume counsel performed reasonably and exercised reasonable professional judgment." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citations omitted).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different trial outcome. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffective-assistance claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371

(2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III. DISCUSSION

**Ground One**  **"Petitioner's right to effective assistance of counsel pursuant to the Sixth Amendment and Strickland v. Washington, 466 U.S. 668 (1984), was violated when his counsel elicited evidence in violation of Petitioner's right to confront evidence pursuant to the Sixth Amendment and Crawford v. Washington, 541 U.S. 36 (2004)." Doc. 20 at 1.**

Arrowood claims that his trial counsel, Baja Harrison, was ineffective for eliciting a hearsay statement during cross-examination of the lead investigator—FDLE Special Agent Albert Willis. Doc. 7 at 9; Doc. 10 at 9-10; Doc. 20 at 1. The hearsay statement was Manden Whiddon's post-arrest statement to Willis that Arrowood hid two of the stolen firearms in an outbuilding on the Whiddon's property. Doc. 10 at 9-10. Arrowood asserts that the hearsay statement otherwise

would have been inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), because Whiddon was unavailable to testify at a pre-trial deposition and at Arrowood's trial due to pending criminal charges for the burglary and murder. Doc. 10 at 11.[5]

Arrowood claims that Harrison made matters worse by then asking Willis why he believed Whiddon's statement, thereby allowing Willis to "bolster" Whiddon's credibility by explaining why. Doc. 10 at 10-12. Arrowood claims that counsel's questioning prejudiced the defense because it elicited "the only evidence of guilty knowledge on the part of Arrowood and the only evidence of possession of recently stolen property, which went unaddressed and undisputed during the entire trial." *Id.* at 10. Arrowood argues that as a result of counsel's error, Arrowood "never got to confront the witness who said he hid firearms stolen from the victim's residence." *Id.* at 11.

Arrowood asserts that he presented this ineffective-assistance claim to the state courts in "Ground Four" of his amended Rule 3.850 motion. Doc. 10 at 3, 10 (citing that portion of the Rule 3.850 motion). Arrowood claims that he is entitled to

---

[5] In *Crawford*, the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54. The Court clarified that the term "testimonial" applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68.

habeas relief because (1) the state court's rejection of his claim involved an unreasonable application of the *Strickland* standard and (2) the court failed to address the right-of-confrontation issue, or at least "failed to apply the clearly established federal law of the right to confront one's accusers pursuant to the Sixth Amendment and <u>Crawford</u>. . . ." Doc. 10 at 13-15, 17.

The State concedes that Arrowood exhausted this ineffective-assistance claim in the state courts. Doc. 15 at 18. The State argues that Arrowood is not entitled to relief because he fails to satisfy § 2254(d)'s demanding standard. *Id*. at 17-37.

### A.    *State Court's Decision*

The state circuit court entered a written order denying postconviction relief. Doc. 15-3, Ex. A at 2194-2238. The state court identified the two-pronged *Strickland* standard as the controlling legal standard, *id*. at 2195, and rejected the claim for these reasons:

### <u>IAC Ground 4: Eliciting Inadmissible Opinion and Hearsay Evidence</u>

> In Ground 4, the Defendant argues that trial counsel was ineffective for eliciting inadmissible opinion evidence and hearsay during the cross examination of Agent Albert Willis. The Defendant argues that Manden Whiddon's hearsay statements "made to law enforcement were inadmissible and such was acknowledged by all counsel." *Amended Motion at 36*. The Defendant claims that "Attorney Harrison's questioning in eliciting improper opinion testimony and the aforestated hearsay was ineffective and the defendant was prejudiced by such and did not receive a fair trial because of such." *Amended Motion at 36*.

The Defendant's trial counsel explained that he knew, at the time, that this amounted to inadmissible hearsay evidence. *Evidentiary Hearing Transcript at 315*. Nonetheless, he opted to elicit this testimony as part of his trial strategy:

> [STATE]: Why then did you elicit this hearsay testimony from Agent Willis?
>
> [TRIAL COUNSEL]: As time went on, we got a very lucky break from the FDLE. We got information to the effect that blood was found in Garrett's vehicle and that blood was linked by DNA analysis to the Whiddons. So now I really had something working for us.
>
> I also had photographs of Ms. Strickland dead in her car and what it showed was that glass from the driver's side window had shattered and there was a back lash and that glass had shattered outward about 12 to 18 inches. Also, very importantly, in the autopsy report of Dr. Clark he states that glass striping is in the side of Ms. Strickland's face.
>
> So now I have got an argument. I have got a real argument to make that the defense is Garett Arrowood did not do this but we have shown you who did and that is the Whiddons because they got cut from this back lash and that is why their blood was in the car.
>
> All right. So, I then put all that together in an opening statement and a closing argument and in a case like this you want to try to draw things together and make a logical argument to a jury as to why your client is not guilty. What I labeled it, I worked on it for weeks, I labeled it a rush to judgment. I said that what happened here was that when this murder took place, this young inexperienced FDLE agent, Albert Willis, coming rolling in from Tallahassee, you've got some of the best local investigators here, Robbie Hooker and Rusty Davis, he pushes them aside and

he is the big shot. He comes in and talks to Manden Whiddon and it is set out right in the complaint, in the arrest complaint, and Willis buys this murdering Manden Whiddon story hook, line and sinker, causes Garrett to be arrested and as Ms. Arrowood informed me he lets these two murderers walk out the door.

So what I wanted to try to show is that Willis had been affected. He been tricked. He had been fooled by the Whiddons. They had fooled him and it had worked and now Garrett is indicted and these guys are walking the street. So to bring that out to show an example of this favoritism that was given the Whiddons, I used the situation where Manden tells Willis it was Garrett who put those guns up there, I wanted to show, to give an example, of this unfair favoritism given to the real killer and my client is sitting in jail looking at the death penalty.

So I considered the pros and cons. I realize that, you know, this is a decision that you make considering all of the factors and I felt that the good for us would clearly outweigh the bad. Here is the reason. If it had been Rusty Davis who found those guns and said that Garrett –

* * *

[TRIAL COUNSEL]: In other words, what I am saying is this, if it had been a preacher or if it had been any reputable person who was the declarant - - you know, when you talk about hearsay you talk about a declarant, the person actually making the statement. If it had been any person with any credibility whatsoever, I wouldn't have opened that door, but Manden Whiddon by all accounts, your account, my account, everything that was fed to that jury was the Whiddons were the murderers. You said and Garrett as well, but I said no.

So the point is that having evidence presented as to what Manden Whiddon had said I didn't think would hurt

> Garrett one bit but it made I think a pretty darn good
> cogent, put together defense. We worked on it for months,
> got great help from Ms. Arrowood. My opening statement
> and closing thing all discussed with Garrett and his family
> and I think it was a pretty darn good way to present the
> case.
>
> *Evidentiary Hearing Transcript at 316-319.* Accordingly, trial
> counsel's eliciting of this otherwise inadmissible hearsay evidence
> from Agent Willis, was the result of trial strategy, which this Court
> finds to be both reasonable and professional given what trial counsel
> knew at the time of trial. Therefore, IAC Ground 4 is denied.

Doc. 15-3, Ex. A at 2209-10. The First DCA affirmed in an unexplained opinion.

Doc. 15-7, Ex. F.

## B.   *Section 2254(d)'s Deferential Standard Applies*

The First DCA's summary affirmance is an "adjudication on the merits" of

Arrowood's claim and, therefore, is reviewed under § 2254(d)'s deferential standard.

*See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state

court and the state court has denied relief, it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary); *Id.*, 562 U.S. at 100 ("This Court now holds

and reconfirms that § 2254(d) does not require a state court to give reasons before

its decision can be deemed to have been 'adjudicated on the merits.'").

Where, as here, there has been one reasoned state judgment rejecting a federal

claim followed by a later unexplained order upholding that judgment, federal courts

employ the following "look through" presumption: "[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. —, 138 S. Ct. 1188, 1192 (2018). Consistent with *Wilson*, this court presumes that the First DCA rejected Arrowood's claim for the reasons provided by the state circuit court.

### C.   *Arrowood Is Not Entitled to Habeas Relief*

The state court's decision is not "contrary to" clearly established federal law, because the state court identified and applied the two-part *Strickland* standard to Arrowood's ineffective-assistance claim. *See Williams*, 529 U.S. at 405-06 (interpreting § 2254(d)(1)). To obtain habeas relief, therefore, Arrowood must show that the state court's decision involved an unreasonable application of the *Strickland* standard, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

Arrowood argues that the state court's application of the *Strickland* standard was unreasonable, because the court ruled that Harrison's strategy of eliciting the hearsay from Willis was reasonable without explicitly addressing "the improper bolstering testimony of Willis vouching for Manden Whiddon's credibility and . . . while not addressing the Petitioner's <u>Crawford</u> violation claim[.]" Doc. 10 at 12; *see*

*also id.* at 13 (arguing that the trial court's rejection of the ineffective-assistance claim was "an unreasonable avoidance of applying <u>Crawford</u> . . .").

The fact that the hearsay testimony Harrison chose to elicit otherwise would have been inadmissible under the Confrontation Clause and *Crawford* does not require application of a different, or an additional, standard than the *Strickland* standard. No Supreme Court case clearly establishes that an ineffective-assistance claim grounded in counsel's eliciting testimony that otherwise would have been inadmissible under *Crawford* must include an explicit analysis applying *Crawford*. Habeas counsel has not identified one, nor has the undersigned found one.

Moreover, an analysis of whether Whiddon's hearsay statement otherwise would have been inadmissible under the *Crawford* rule was unnecessary, as that question was not in dispute. Harrison testified that he knew that Manden Whiddon's statement otherwise would have been inadmissible, and that that was the reason he obtained the prosecutor's agreement—prior to trial—that the State would not attempt to use it. Doc. 15-3, Ex. A at 2000, 2066-67 (Harrison Test.); *see also* Doc. 15-1, Ex. A at 198 (Harrison email to prosecutors). The relevant question, which the state court addressed, was whether Harrison's tactical decision to use the hearsay statement was reasonable.

In that regard, Arrowood appears to suggest that because the hearsay statement otherwise would have been inadmissible under *Crawford*, Harrison's use

of it cannot be deemed reasonable (i.e., that Harrison's conduct was *per se* unreasonable). No Supreme Court precedent clearly establishes that rule. If there is such precedent, habeas counsel has not identified it.[6]

Federal courts addressing similar claims have applied the same *Strickland* framework that the state court applied in this case. *See, e.g., Janoksy v. St. Amand*, 594 F.3d 39, 47-48 (1st Cir. 2010) (*Strickland* standard governed claim that defense counsel was ineffective for sacrificing petitioner's right of confrontation by eliciting otherwise inadmissible hearsay testimony from police officers about deceased accomplice's statements that bolstered the victim's identification of petitioner; counsel's conduct was not unreasonable because it could have added weight to the plausible defense strategy of portraying the accomplice as attempting to shift the blame from himself and of suggesting that the police eschewed a complete

---

[6] "For a petitioner to obtain habeas relief under either the 'contrary to' or the 'unreasonable application' provision of § 2254, there must be a 'clear answer—that is, a holding by the Supreme Court—about an issue of federal law' that is contravened by the challenged state court ruling." *Copeland v. Sec'y, Fla. Dep't of Corr.*, ___ F. App'x ___, No. 20-11742, 2022 WL 1052779, *5 (11th Cir. Apr. 7, 2022) (citing *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286–88 (11th Cir. 2012)). "A state court's decision cannot be contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . unless there is a Supreme Court decision on point." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1304 (11th Cir. 2019) (citation and quotation marks omitted). Further, "it is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quotation marks omitted).

investigation and focused only on the petitioner); *Chestnut v. McDonough*, 199 F. App'x 853, 854-55 (11th Cir. 2006) (*Strickland* standard governed claim that defense counsel was ineffective for eliciting—during cross-examination of sexual battery victim—highly damaging and otherwise inadmissible hearsay statements that described uncharged collateral sexual misconduct; counsel's tactical decision to elicit the testimony in order to attack the victim's credibility and discredit her testimony was reasonable).

Arrowood next argues that the state court's conclusion—that Harrison's performance was reasonable—must be rejected because that conclusion "is unsupported by **any** record evidence, much less competent and substantial evidence." Doc. 10 at 13. This argument lacks merit.

In reviewing the reasonableness of the state court's decision, this court defers to the state court's factual findings, because they are neither "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), nor contradicted by "clear and convincing evidence," *id*. § 2254(e)(1). *See Nejad v. Att'y Gen. State of Ga.*, 830 F.3d 1280, 1283 (11th Cir. 2016). This deference extends to the state court's determination that Harrison's evidentiary hearing testimony was credible. Eleventh Circuit precedent requires this deference. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas

review. Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Applying *Strickland*'s performance prong to the record before the state court, a fairminded jurist could agree with the state court's conclusion that Harrison's representation "fell within the wide range of reasonable, professional assistance." *Chandler*, 218 F.3d at 1314. At the time of Arrowood's trial, Harrison had been a practicing attorney for 48 years and had tried more than 100 felony cases. Doc. 15-3, Ex. A at 1954-55. Because of Harrison's extensive experience, the reluctance to second guess his strategic decisions is even greater. *Chandler*, 218 F.3d at 1316 & n.18 ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger[,]" because "[e]xperience is due some respect."); *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994) ("[T]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment . . . was reasonable under the circumstances." (quoting *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989))); *see also Barrett v. Sec'y, Fla. Dep't of Corr.*, 625 F. App'x 385, 390 (11th Cir. 2015) (applying an "even stronger" presumption that counsel's conduct was reasonable

because counsel had been a practicing attorney for nearly two decades and had represented more than 50 homicide defendants at trial).

Harrison testified that he purposely elicited Manden Whiddon's hearsay statement from Willis as part of the "rush to judgment" theory. Harrison had thoroughly investigated both the law and the facts relevant to possible defenses before deciding that the "rush to judgment" theory was Arrowood's best defense. Doc. 15-3, Ex. A at 1953-2010 (Harrison Test.). Arrowood does not challenge the reasonableness of the "rush to judgment" defense. In fact, according to Harrison, whom the state court credited, Arrowood and his family agreed with Harrison's defense strategy. *Id*. at 2004. The state court reasonably deferred to Harrison's strategic decision to advance the "rush to judgment" defense.

The hearsay statement at issue is Willis's testimony that after Manden Whiddon led Special Agent Willis and his team to the Whiddons' outbuilding, Whiddon told Willis: "I'm telling you, Garrett walked in here [the outbuilding] with these guns, they've got to be here somewhere." Doc. 15-2, Ex. A at 1134, 1135. Harrison's pre-trial stipulation with the State gave the defense exclusive control over the use of Manden Whiddon's hearsay statement and allowed the defense to determine if and how it would be used.

Consistent with the defense strategy, during opening statements, Harrison painted the Whiddons as the actual killers who cozied up to Willis so they could

control the investigation and misdirect it toward Arrowood. Doc. 15-2, Ex. A at 911-29. During Harrison's cross-examination of Willis, Willis acknowledged that he was unable to develop any forensic evidence linking Arrowood to the crimes. Doc. 15-2, Ex. A at 1126-28. Willis also acknowledged that he was able to locate the stolen firearms only because Manden Whiddon provided a tip that they were in the outbuilding. Although the Whiddons were suspects at the time with Arrowood, Manden's tip resulted in him and his father being treated more favorably than Arrowood—as "cooperating witnesses." Doc. 15-2, Ex. A at 1129. Willis admitted that because of Manden's tip, he allowed the Whiddons to walk out of jail while Arrowood—and only Arrowood—was indicted for the murder. *Id.* at 1129-31. Thus, Harrison used Manden's hearsay statement to show how Willis's investigation, from the beginning, was directed by a biased source in a predictable direction—toward Arrowood.

A fairminded jurist reading the trial transcript in its entirety, along with Harrison's postconviction evidentiary hearing testimony, could agree with the state court's conclusion that Harrison's decision to elicit the hearsay statement was based on his professional judgment. Harrison testified that he weighed the pros and cons of introducing the hearsay and determined that "the good for us would clearly outweigh the bad." Doc. 15-3, Ex. A at 2003; *see also* Doc. 15-2, Ex. A at 1120-46 (Harrison's cross-examination of Willis). A fairminded jurist also could agree with

the state court's determination that Harrison's professional judgment—balancing the potential risk and reward of eliciting a detailed account of Manden Whiddon's involvement in the investigation, including his statement to Willis—was reasonable. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681.

In other words, it was reasonable for the state court to defer to Harrison's professional judgment that the damaging effect of the hearsay statement was outweighed by the value of the jury hearing how extensively the investigation was influenced by Manden Whiddon. As Harrison explained: "I used the situation where Manden tells Willis it was Garrett who put those guns up there. I wanted to show, to give an example, of this unfair favoritism given to the real killer and my client is sitting in jail looking at the death penalty." Doc. 13, Ex. A at 2003 (Harrison Test.). Harrison later summarized:

> I felt shortly prior to trial, and certainly during the examination, that I saw an opening to make a point for Garrett. I was not at all concerned that anything Manden Whiddon would have said first hand or third hand would have been believed by that jury. So I did what I did because I believe it helped him.
>
> This is – in our business you have to make these strategic decisions from time to time. It was a good example of what we were trying to say, what the Arrowood family was trying to say. They

arrested the wrong man and they based it on two or at least one cold-blooded killer that I had proved had blood on his hands.

Doc. 15-3, Ex. A at 2088-89.

Arrowood asserts that Manden Whiddon's hearsay statement to Willis—that he saw Arrowood enter the outbuilding with two guns and exit without them—was the only evidence connecting Arrowood to the burglary and stolen guns. Doc. 10 at 10, 13. That is incorrect. The State also presented evidence that (1) Strickland's Kel-Tec .32 caliber pistol was found in Arrowood's bed underneath his pillow, Doc. 15-2, Ex. A at 1080, 1156-57, 1347; (2) ammunition for Strickland's .357 revolver was found in the front center console of Arrowood's vehicle, *Id*. at 1289-90; and (3) Arrowood attempted to sell Strickland's Smith & Wesson .45 caliber pistol to Troy Whitehurst, *Id*. at 1035-36. Harrison was aware of this evidence when he asked Willis the question. Doc. 15-3, Ex. A at 2066 (Harrison Evidentiary Hr'g Test.).[7]

In addition to Arrowood's possession of Strickland's recently stolen property, other evidence linked him to the burglary. This evidence included (1) testimony that

---

[7] Harrison attempted at trial to show that this evidence, too, was subject to the Whiddons' manipulation, or was attributable to the Whiddons themselves. Harrison emphasized that the Whiddons also slept in the camper with Arrowood, and that Arrowood told police that he never saw the Kel-Tec .32 caliber handgun when it was in the camper. Doc. 15-2, Ex. A at 1352-53, 1357-58. In addition, the Whiddons were in Arrowood's vehicle frequently, and Rodney Whiddon's blood was found on the front passenger seat inches from the center console where the .357 caliber bullets were found. Doc. 15-2, Ex. A at 1139, 1288-90, 1294-95, 1309-10, 1349. Troy Whitehurst was Manden Whiddon's stepfather. Doc. 15-2, Ex. A at 1041-42.

Arrowood was familiar with Strickland's home, including her collections of valuable arrowheads and firearms; (2) testimony that Arrowood was at Strickland's home with the Whiddons earlier in the day on June 22, 2015, to haul trash from her home; (3) testimony that Arrowood knew that various vehicles would be parked in Strickland's yard even when no one, or only Strickland, was home; (4) testimony that there were no signs of forced entry into Strickland's home; (5) testimony that Strickland's home was not ransacked; rather the burglar knew what he wanted to steal and where to find it; (6) testimony that Arrowood knew that Strickland's garage door opener and a house key were located inside Strickland's daughter's unlocked truck parked in the front yard; (7) testimony from various people that Arrowood began soliciting Strickland's arrowheads the morning of June 24, 2015; (8) testimony and video evidence that Arrowood was soliciting arrowheads to Owen Raulerson outside a Walgreens on the morning of June 24, 2015, and that when Arrowood's father pulled up to the store Arrowood got very nervous, commented that his father was there, and began concealing the arrowheads; (9) testimony that a couple of days after the murder, Arrowood told his drug dealer that he was wanted for "a VOP or something" and had to get out of town; and (10) Arrowood's various inconsistent statements to police concerning his whereabouts and activities around the time of the burglary. Doc. 15-2, Ex. A at 944-1186.

Concerning Arrowood's claim that counsel improperly elicited testimony from Willis that bolstered Manden Whiddon's credibility, Harrison testified, and the trial transcript confirms, that Harrison asked Willis to specify *why* he believed Manden Whiddon as part of his strategy to emphasize Willis's allegiance to the Whiddons. Willis's defensiveness of Manden Whiddon supported Harrison's theory of favoritism. Willis's insistence that Manden had not lied, even though a grand jury now had indicted Manden for the murder, played into Harrison's "rush to judgment" argument and his attempt to discredit the investigation. Doc. 15-3, Ex. A at 1444-45, 1453-54. A fairminded jurist could agree with the state court's conclusion that Harrison's line of questioning was a reasonable way to develop the defense strategy.

In sum, the state court's conclusion—that Harrison satisfied *Strickland*'s deferential standard—is supported by the record and falls within the bounds of reasonableness under the AEDPA. *See Woods v. Etherton*, 578 U.S. 113, 119 (2016) (emphasizing the AEDPA's "doubly deferential" standard in reversing grant of habeas relief on ineffective-assistance claim grounded in Confrontation Clause violation); *Burt*, 571 U.S. at 15 ("When a state prisoner asks a federal court to set aside a [conviction or] sentence due to ineffective assistance of counsel . . . our cases require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." (internal quotation marks and citation omitted)).

The state court's rejection of Arrowood's claim was not contrary to and did not involve an unreasonable application of clearly established Federal law. Nor was the decision based on an unreasonable determination of the facts. Arrowood is not entitled to habeas relief on Ground One.

**Ground Two**      **"Petitioner's right to counsel, pursuant to the Sixth Amendment and Strickland v. Washington, was violated by counsel's elicitation of inadmissible evidence that undermined Petitioner's defense." Doc. 7 at 11.**

In Ground Two, Arrowood repeats his claim concerning counsel's eliciting "inadmissible bolstering" testimony from Agent Willis concerning why he believed Manden Whiddon. Doc. 7 at 11; Doc. 10 at 17-19. Because this claim was addressed in Ground One, it will not be re-addressed here. *See* discussion Ground One, *supra*.

Arrowood also claims in Ground Two that Harrison was ineffective for eliciting inadmissible lay opinion testimony from two State witnesses—Agent Willis and Dr. Clark (the medical examiner). Arrowood asserts that the lay opinions undermined the defense theory that the Whiddons shot Strickland through the car window and were injured by the shattered glass (thus explaining their blood inside Arrowood's vehicle). Doc. 7 at 11; Doc. 10 at 19- 23. Arrowood asserts that he exhausted this claim by presenting it to the state courts as "Ground Four" of his amended Rule 3.850 motion (discussed above). Doc. 7 at 11-12; Doc. 18 at 5-6.

The State asserts a procedural default defense. The State maintains that although Willis's alleged lay opinion testimony was included in the trial transcript excerpts attached to Arrowood's amended Rule 3.850 motion (because it was part of Harrison's cross-examination discussed in Ground One above), Arrowood failed to squarely present the "lay opinion" issue as a discreet sub-claim. Instead, Arrowood's postconviction counsel raised the "lay opinion" claim for the first time in Arrowood's postconviction appeal. The State argues that the First DCA's silent affirmance likely was based on a state procedural bar, because that bar is firmly established and was outlined in the State's postconviction answer brief. Doc. 15 at 38-41. In the alternative, the State asserts that if deemed properly exhausted in the state courts, Arrowood fails to show that the state court's rejection of the "lay opinion" claim is not entitled to AEDPA deference. Doc. 15 at 41-46.

Arrowood counters that his amended Rule 3.850 motion mentioned "inadmissible opinion testimony" in the title of "Ground Four," and that the portions of the trial transcript he attached included Willis's lay opinion. Doc. 18 at 5. Arrowood also asserts that this issue "was specifically and explicitly brought to the Court's attention" in a footnote in his written closing argument to the state circuit court. *Id*.; *see also* Doc. 15-3, Ex. A at 2165-66 n.1 (Arrowood's written closing argument). Arrowood argues that the fact that the state circuit court's order specifically identified "Ground Four" as involving counsel's "eliciting inadmissible

opinion and hearsay evidence" makes it clear that the court was aware of the "lay opinion" claim. *Id*. at 6.

## A. *Federal Habeas Exhaustion Requirement*

"[A]ny federal claims presented to a district court in a habeas petition from a state prisoner must have first been exhausted in the state court system." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1128-29 (11th Cir. 2022). The Eleventh Circuit emphasized in *Green*:

> Comity requires that the state courts be given the "opportunity to pass upon" the prisoner's claims and, should they find any valid claims, to take appropriate corrective action. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Specifically, the prisoner must "use the State's established appellate review procedures before he presents his claims to a federal court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).
>
> Comity also requires that the claims the prisoner presents to the district court be the *same claims* the prisoner exhausted in the state courts. To the extent the claims are not the same—in terms of their "legal theory and facts on which [they] rest[ ]"—as the claims exhausted in the state courts, the federal court will treat the claims as unexhausted. *Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003)

*Green*, 28 F.4th at 1129 (citations shortened).

Assuming to Arrowood's benefit that the Florida courts deemed the "inadmissible lay opinion" issue to have been properly presented to both the circuit and district courts, and further assuming to Arrowood's benefit that neither state court deemed the claim procedurally barred, the First DCA's decision is considered

an adjudication on the merits of this claim and is entitled to AEDPA deference. *See Richter*, 562 U.S. at 99, 100; *see also Johnson v. Williams*, 568 U.S. 289, 298, 300-301 (2013) ("[I]t is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference." . . . "[B]ecause it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the *Richter* presumption in cases like the one now before us. When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

Arrowood has not rebutted the presumption that the First DCA adjudicated his claim—and rejected it—on the merits.

### B.    *Arrowood Is Not Entitled to Habeas Relief*

The following provides context for reviewing the reasonableness of the First DCA's decision. Ms. Strickland's father (Michael O'Steen), who found her body, testified at trial that the driver's side window of her car was "blown out" and that glass was lying everywhere both inside and outside of her vehicle. Doc. 15-2, Ex. A at 956. Ms. Strickland's son (Michael Strickland) confirmed that "glass was everywhere." *Id*. at 958. Photographs of the shattered driver's side window showed glass two feet away from the vehicle. *Id*. at 1122-24.

Manden Whiddon's and Rodney Whiddon's blood was found inside Arrowood's vehicle. Rodney's blood was on the interior rear driver's side door and on the front passenger seatback. Manden's blood was on a blue shirt recovered from the vehicle's back seat. *Id*. at 1309-11, 1315, 1318. No blood evidence—or any other forensic evidence—was linked to Arrowood. *Id*. Arrowood told police that the Whiddons borrowed his truck on occasion without permission. *Id*. at 1349.

Harrison argued to the jury that this physical evidence pointed to the Whiddons having committed the robbery and murder alone using Arrowood's vehicle. Harrison theorized, as reasonable doubt, that in the course of shooting Ms. Strickland, the Whiddons suffered lacerations from the glass shattering. Doc. 15-3, Ex. A at 1439-64.

The First DCA's rejection of Arrowood's claim that Harrison improperly elicited damaging lay opinion testimony, involved a reasonable application of the *Strickland* standard. The trial transcript shows that during cross-examination, Agent Willis testified to his personal observation that the shattered glass was both inside and outside of Strickland's vehicle. Doc. 15-2, Ex. A at 1122. Willis avoided expressing an opinion on whether the glass could have cut the shooter. When asked whether the glass was sharp, Willis answered "I don't know to be honest. . . . I don't know if it's sharp or not." *Id*. at 1122-23. When asked whether the sprayed glass

could cut someone, Willis answered, "I just don't know." *Id*. at 1123. Willis later said:

> A [Agent Willis]  I don't know how it broke when the round was fired through it. It just depends. I mean I've seen people murdered in cars where all you have is nice little neat holes and I've seen times like this where the glass just broke and fell apart.
>
> Q [Harrison]  Okay.
>
> A  But as far as you're talking in terms of velocity shrapnel from a passing projectile, I just – I'll be the first to tell you I'm not an expert in the field. A forensic expert could probably better tell you about that.
>
> Q  All right. I understand, but you do acknowledge that some of the glass was outside of the car and it was several feet away from the car?
>
> A  Yes.
>
> Q  Is that fair to say?
>
> A  Yes.
>
> Q  All right. You've been deeply involved in this investigation. Where was the person or persons standing when Ms. Strickland was shot?
>
> A  I don't know. My best guess would be outside the driver's side window. . . .

Doc. 15-2, Ex. A at 1123-24.

Concerning Dr. Clark, when Harrison asked Clark whether "in the realm of reasonable probability, the shooter could have been injured as well," Dr. Clark responded that he "wouldn't know for sure." Doc. 15-2, Ex. A at 1329-30.

A fairminded jurist could agree with the state court's conclusion that Arrowood failed to demonstrate that Harrison elicited inadmissible lay opinions that prejudiced the defense.

To the extent Arrowood suggests that Harrison was ineffective for failing to investigate and retain an expert on safety glass, *see* Doc. 10 at 20, 23, the state court's rejection of this aspect of the claim was a reasonable application of *Strickland*. Harrison testified at the postconviction evidentiary hearing that he made a strategic decision not to retain an expert:

> Q [Postconviction Counsel]  Mr. Harrison. I wanted to follow up a little bit on our conversation we were having about why you didn't hire an expert to I guess explain to the jury what we call the blood and glass or I call the blood and glass theory. I wasn't clear on the answer that you had given about that. Was it because you didn't need an expert because the evidence was so just – in your own words, if you could?
>
> A [Attorney Harrison]   Yes, I think that's a fair assessment. A photograph is worth, you know, the testimony of an expert. This information was developed by an expert with the FDLE and I have learned when you can use the opposition's own experts, when they help your case, why not do it.
>
> Q  What expert from FDLE proved your theory of showed that your theory was credible in this case?
>
> A.  Are you talking about the theory that the real murderers were cut by the glass?
>
> Q  I am talking about the theory that the Whiddons were the persons who really committed the crime because the projectiles that went through the victim's car into the safety glass and the safety glass fell down, what experts – or not the safety glass, but spewed out as you said

and subsequently some blood of the Whiddons were found in the Arrowood car. What expert did you call that said, yes, I agree with that and that means or is at least circumstantial evidence that the Whiddon[s] were the shooters?

A  I didn't need an expert. The evidence spoke for itself. It is pretty clear at trial. Here you have got the vehicle.

Q  I am not asking that.

A  If I can answer the question.

Q  I just asked about what expert did you call.

A  That's not what you asked. But I didn't call any expert.

Q  Now, I thought you said you used the other expert, the FDLE expert?

A  I used the report and I think we stipulated to the entry of the photographs. You have got the photographs. It clearly shows shattered glass regardless of what Agent Willis said, you now. That this stuff doesn't shatter. Well, it sure does. It was out 18 inches from the car. It makes perfect sense that the people that were there killing this poor lady got cut by that glass. Why else was it in Garrett's vehicle? If I am wrong, it sure makes a lot of sense to the jury.

Q  Okay. So what you are saying is it was your argument and the evidence that you presented and not an expert that you used to propose that theory?

A  Yes.

Q  And in fact if you had hired an expert an expert probably – or may disprove that theory, so it would be better not to use an expert?

A  I did not need an expert. How do you argue that glass from the driver's side of that vehicle doesn't shatter when it is right there in the photograph?

Doc. 15-3, Ex. A at 2075-78. Harrison summarized that instead of retaining an expert, he decided to "present common sense evidence that helps the defendant." *Id*. at 2079. A fariminded jurist could agree with the state court's determination that Harrison's professional judgment was reasonable.

It bears emphasizing that Harrison's strategy was *to raise reasonable doubt* about Arrowood's participation in the burglary and murder by using the blood and shattered glass evidence to lay culpability for the crimes on the Whiddons. Harrison reasonably chose not to overplay his hand. Ultimately, the jury decided that the State *failed* to prove beyond a reasonable doubt that Arrowood actually possessed a firearm during the burglary and murder. In other words, Arrowood himself was not the one who pulled the trigger. This implies that Harrison's strategy was effective in that regard.

It was neither contrary to, nor an objectively unreasonable application of the *Strickland* standard for the state court to reject Arrowood's ineffective-assistance claim. Arrowood is not entitled to habeas relief on Ground Two.

## IV.    A CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.  The amended petition for writ of habeas corpus, Doc. 7, challenging the judgment of conviction and sentence in *State of Florida v. Garrett Ashton Arrowood*, Taylor County Circuit Court Case No. 2015-CF-198, be **DENIED**.

2.  The District Court **DENY** a certificate of appealability.

3.  The clerk of court close this case file.

At Panama City, Florida, this 20th day of April, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**